# CASES

IN THE

# SUPERIOR COURT

OF

## PENNSYLVANIA.

---

## Price *v.* Walton, Appellant.

*Municipalities—Cities of the first class—House of detention—Municipal or county officers—Contracts—Advertisements—Act of July 2, 1901, P. L. 601.*

1. Under the Act of July 2, 1901, P. L. 601, entitled "An act to establish in cities of the first and second class a house or houses of detention for delinquent, dependent and neglected children and providing for the management and maintenance thereof," the board of managers of the house of detention of Philadelphia, performs not a municipal, but a county function, and it is not necessary for them in contracting for material either to execute a written contract or to advertise it.

The Act of July 2, 1901, P. L. 601, does not contravene sec. 3 of art. III of the constitution as being insufficient in title; nor does it contravene sec. 7 of art. III of the constitution as being a local or special law regulating the affairs of counties, cities, etc.

Argued Oct. 19, 1911. Appeal, No. 84, Oct. T., 1911, by defendant, from judgment of C. P. No. 5, Phila. Co., June Term, 1910, No. 2,469, awarding writ of peremptory mandamus in case of Eli Kirk Price et al., Board of Managers of the House of Detention for the Reception of Untried Juvenile Offenders and Neglected and Dependent Chil-

VOL. XLIX—1                                    (1)

dren under the age of sixteen years, in the Case of the City of Philadelphia v. John M. Walton, City Controller of the County of Philadelphia. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Petition for mandamus.

STAAKE, J., filed the following opinion:

On July 2, 1910, this court issued a writ of alternative mandamus, on the petition of the Board of Managers of the House of Detention, directed to John M. Walton, city controller. The case comes before the court on this petition and the return made thereto on July 18, 1910.

The petitioners were duly appointed by the judges of the courts of oyer and terminer, and general jail delivery and quarter sessions of the peace, for the county of Philadelphia, as a Board of Managers of the House of Detention for the Reception of Untried Juvenile Offenders and Neglected and Dependent Children, under the age of sixteen years, in the city of Philadelphia, under the provisions of the Act of assembly, approved July 2, 1901, P. L. 601. This act requires that in every city of the first and second class there shall be provided a House or Houses of Detention for the reception of the juvenile delinquents and dependents, described in the act, which shall be maintained by a board of five managers, two of whom shall be women, whose duties are described in the act. The fifth section of the act provides:

"Expenses incurred in the performance of the said duties of the Board of Managers shall be itemized and presented with proper vouchers to the county commissioners of the county containing the city for which said Board of Managers may be appointed, who shall be required to pay the said expenses."

In the performance of their duties, the board, in the month of March, 1909, purchased from William Bryant forty-eight tons of coal, at a cost of $186.20, and in the months of March, June and July, from John Wanamaker

certain furnishings for said House of Detention, at a cost of $508.85. It is not contended that these purchases were not necessary for the proper maintenance of the house and its inmates.

The board, in accordance with the requirements of sec. 5 of the act of 1901, presented itemized bills, with proper vouchers therefor, to the commissioners for the county of Philadelphia, who thereupon drew their warrants directed to the Philadelphia city treasurer, in favor of the said William Bryant and John Wanamaker, for the amount of their respective bills, and delivered these warrants to John M. Walton, controller of the city of Philadelphia, for his countersignature, according to law. It was admitted that at the time of the delivery of these warrants to the controller, respondent, there remained, and at the time of the answer filed, still remained unexpended a balance of appropriations made by the select and common councils of said city of Philadelphia to the said commissioners for the maintenance of the said House of Detention, more than sufficient to pay these two bills. Each of these bills was accompanied by a certificate of its correctness and of its approval by the relators, the Board of Managers of the House of Detention, as provided by law.

The respondent, the controller of the city, whose duty, the relators aver, was to countersign the warrants for payment by the city treasurer, refused to countersign the warrants, or either of them, and thus "prevented the relators from performing their duties under the act of 1901, and jeopardized the care and management of the House of Detention."

The respondent sets up, in justification of his refusal to attach his countersignature to the warrants, that the board did not present proper vouchers for the payment of the bills to the commissioners, in that:

1. They presented no written contract previously entered into by the city of Philadelphia with William Bryant and John Wanamaker for the furnishing of the goods.

2. Neither the board nor the commissioners entered into any contract, in writing, in the name of the city of Philadelphia, with either William Bryant or John Wanamaker, for the purchase of the goods furnished.

3. Neither the board nor the commissioners submitted to the city controller any contract for the furnishing of the goods by William Bryant or John Wanamaker, as provided by the Act of June 1, 1885, P. L. 37, 51, and the Act of May 23, 1874, P. L. 230, 233.

4. No advertisement was made by the board, nor by the commissioners for the furnishing of the said fuel and furnishings, as required by the Act of May 23, 1874, P. L. 230, 233, and the ordinances of July 5, 1877, and December 26, 1882.

The respondent:

(a) Denied the authority of the commissioners to draw and of the controller to countersign the warrants for the payment of the two bills, upon the receipt only of the certificate of the board as to the correctness of the bills.

(b) Averred that the appropriations by councils were to the commissioners, as officers of the city of Philadelphia, and that the commissioners were not authorized to draw warrants against the appropriations, "except in payment of the contract price" of fuel and materials furnished, upon contracts duly advertised, let and executed, in accordance with the said acts of 1874 and 1885, denied it was his duty to countersign the warrants and admitted his refusal to so countersign.

(c) Averred that by the ninth section of the Act of July 2, 1901, P. L. 601, the cost and expenses of maintaining the houses of detention, established by the act, shall be provided by the respective counties as the cost and expense of maintaining county prisons are now provided; and further averred that the cost and expense of maintaining county prisons in the county of Philadelphia is provided for at present by the terms of the act of May 23, 1874, and the ordinance of December 26, 1882,

under which the inspectors of the Philadelphia County Prison are directed to advertise for all fuel, supplies, work and materials required by them, three times in two daily newspapers, and the contract for the supply of said articles is awarded to the lowest responsible bidder, in accordance with the act of 1874, and the controller is required not to countersign any warrant on the city treasurer unless he shall be furnished with a copy of the schedule of bids, copy of advertisement and a statement of the award of contracts; that these provisions of the ordinances and act of assembly are now in fact carried out by the inspectors of the Philadelphia County Prison, and were so on and prior to July 21, 1901, and that the cost and expenses of maintaining the Philadelphia County Prison are now provided for in the manner stated.

(d) Averred that the relators, the members of the board, as well as the city commissioners, are officers of the city government of Philadelphia, a city of the first class, and not county officers, and that he is advised "they are respectively limited and restrained in their expenditure of city money by all of the statutes limiting and regulating the expenditures of money by officers and departments of the city of Philadelphia."

(e) Averred that the act of assembly, of July 2, 1901, under which the petitioners claim to hold office, is unconstitutional and void, in that it violates sec. 3, art. III, of the constitution of Pennsylvania, which provides:

"No bill . . . . shall be passed containing more than one subject, which shall be clearly expressed in its title."

The title to the said act of assembly being: "An act to establish in cities of the first and second class, a house or houses of detention for delinquent, dependent and neglected children, and providing for the management and maintenance thereof," while the body of the act provides that the cost incurred in the performance of the duties of the Board of Managers shall be paid by the commissioners of the county containing the city in which the House of Detention is established.

(f) Averred that the act of assembly of July 2, 1901, is unconstitutional and void, in that it offends against art. III, sec. 7, of the constitution of Pennsylvania, which provides:

"The General Assembly shall not pass any local or special law . . . . regulating the affairs of counties, cities," etc., whereas, the act provides for the maintenance of houses of detention "in every city of the first and second class," and sec. 5 provides that:

"Expenses incurred in the performance of said duties shall be itemized and presented with proper vouchers to the county commissioners of the county containing the city for which said Board of Managers shall be appointed, which shall be required to pay said expenses."

(g) Averred that the joinder of the two purchases in one writ of mandamus is improper and illegal.

The questions to be determined are:

1. Are the relators, the managers of the House of Detention, city or county officers?

2. Are materials for the maintenance of the House of Detention, materials "required by the city"? And do the contracts made by the managers of the House of Detention "relate to city affairs," so that they are to be awarded upon due advertisement and to be in writing?

3. Is the act of July 2, 1901, under which the relators hold office, unconstitutional for the reasons advanced by the respondent?

The first and second questions can be considered together.

The Act of May 23, 1874, P. L. 230, 233, requires:

"Section 6. All stationery, printing, paper and fuel used in the councils, and in other departments of the city government, and all work and materials required by the city, shall be furnished, and the printing and all other kinds of work to be done for the city shall be performed under contract, to be given to the lowest responsible bidder, under such regulations as shall be prescribed by ordinances; and it shall be the duty of councils forthwith

to enact such ordinances; no member or officer of councils, or any department of the city government, shall be in any way interested in such contracts, directly or indirectly, either at its inception or during the progress of its fulfillment, or furnish any materials or supplies or labor for such contracts."

The ordinance of councils of July 5, 1877 (p. 200) provides:

"Section 1. That all contracts requiring the signature of the mayor that may be entered into in behalf of any of the departments of the city of Philadelphia, for materials to be furnished or work to be done, shall not be altered in any material matter, either in quantity of materials to be furnished, work to be done or prices to be paid for said work and materials, without the chief of the department for which said contract has been entered into, shall have previously laid before councils a plan and estimated cost of the proposed changes, and obtaining the consent of councils to the proposed changes and alterations."

The Act of June 1, 1885, P. L. 37, 51, commonly called the "Bullitt Bill," by art. XIV, relating to contracts, provides:

"Section 1. All contracts relating to city affairs shall be in writing, signed and executed in the name of the city, by the officer authorized to make the same after due notice, and, in cases not otherwise directed by law or ordinance, such contracts shall be made and entered into by the Mayor."

By these acts, written contracts, let after due advertisement, are required only for materials "required by the city," or where the contracts "relate to city affairs." Now, are materials for the maintenance of the House of Detention "materials required by the city," and do contracts for such materials "relate to city affairs"?

The Board of Managers of the House of Detention was created by the Act of July 2, 1901, P. L. 601, entitled:

"An act to establish in cities of the first and second

class a house or houses of detention for delinquent, dependent and neglected children, and providing for the management and maintenance thereof.''

Section 1 provides:

"That in every city of the first and second class there shall be provided, in the way hereinafter mentioned, a house or houses of detention for the reception of untried juvenile offenders and neglected and dependent children, under the age of sixteen years, who may be in the custody of an officer appointed or elected under any law of this commonwealth, and whose cases may be under judicial investigation under any laws of this commonwealth, pending such investigation and final determination of such case or cases.''

While this act is entitled, "to establish in cities of the first and second class," a house or houses of detention, the subjects to be kept in such house or houses are children under a certain age in the custody of an officer appointed or elected under any law of the commonwealth, whose cases are under judicial investigation, pending such investigation. Although this judicial investigation is done within the limits of cities of the first and second class, it is not city work, but county work. The managers are appointed by the judges of the courts of oyer and terminer, and general jail delivery, and the courts of quarter sessions of the peace, having jurisdiction in the said respective cities: Sec. 2, act of July 2, 1901. These judges are state officers, and the managers are "subject to removal by the judge of the said court:" Sec. 2, act of July 2, 1901. The district attorney who appears for the commonwealth in the cases of children held for trial and the clerk of the court in custody of the records of such trials are county officers: Art. XIV, sec. 1, constitution of the commonwealth.

The Act of March 31, 1876, sec. 17, P. L. 13, declares:

"In all cases where a city containing over 300,000 inhabitants is co-extensive in boundaries with the county, all of the officers known therein as city treasurer, city

controller, city commissioners shall severally be regarded as county officers and shall have all the powers and perform all the duties herein enjoined, and subject to the same penalties as if they had each been elected or appointed as county officers and had been designated as such."

The maintenance of the house is something done in aid of the administration of justice in dealing with untried juvenile offenders. Therefore, contracts made for materials for the maintenance of the House of Detention are not for materials "required by the city," and do not "relate to city affairs."

The act of July 2, 1901, also provides:

"Section 5. Expenses incurred in the performance of the said duties of the Board of Managers shall be itemized, and presented with proper vouchers to the county commissioners of the county, containing the city, for which said Board of Managers may be appointed, who shall be required to pay the said expenses," and further provides:

"Section 9. The cost and expenses of maintaining the houses of detention by this act established, shall be provided by the respective counties containing the said house or houses of detention, as the cost and expenses of maintaining county prisons are now provided."

The respondent admits that "appropriations were made by the city councils to the said city commissioners, as officers of the city of Philadelphia," and "that there now remains unexpended a balance of appropriations made by the select and common councils of said city of Philadelphia to said city commissioners for the maintenance of the said House of Detention, more than sufficient to pay said bills."

While we may concede that since the passage of the act of February 2, 1854, the county commissioners have had no power to levy taxes or collect money, and that "they have been entirely subject to the councils of the city of Philadelphia," and could expend only such moneys as were appropriated to them by the said

city councils, must we not conclude, not only from this appropriation by councils to the commissioners, for the House of Detention, which has been admitted by respondent, but also from the records of this court, No. 2,549, March Term, 1904, in the case of A. W. Estlin v. Philadelphia, in which on April 19, 1904, a mandamus was issued against the city for $8,970.17, being the amount of a judgment on a case stated, that the councils have recognized the duty of the county commissioners, under the law, to provide the moneys needed for the erection of the House of Detention, as well as for its maintenance. In the Estlin case, the court held that under the Act of April 3, 1903, P. L. 137, providing that the "county commissioners in each county" should provide a suitable building for the confinement of children awaiting trial, the county must pay for such property purchased by the city commissioners, thus holding them to be county officers. As it is common knowledge that the councils have provided all the moneys required for the maintenance of the House of Detention since the passage of the act of July 2, 1901, may we not assume that the county commissioners of the county containing the city have taken the necessary action to secure under the law the appropriation of such moneys, so that they could draw the warrants to pay the expenses of such maintenance, which they have drawn. This is not a case of the county commissioners levying a tax for the raising of the money to pay the expenses, but of drawing warrants for money already appropriated for the payment of the expenses of maintenance.

Section 13 of the Act of February 2, 1854, P. L. 21, 31, provides, inter alia:

"The city commissioners, under the direction and control of the city councils, shall be charged with all duties relating to assessors and to assessments, to the selection and drawing of jurors and to election officers, that are now performed by the county commissioners,

and all other duties now performed by the commissioners at the county not otherwise provided for in this act."

In Wright v. Philadelphia, 8 W. N. C. 141, it was held:

"This section imposes upon the city commissioners the duty of furnishing the sheriff with the necessary supplies, subject to the control of councils, who may require the city commissioners to advertise for such supplies, and to give the contract to the lowest bidder if they think it requisite or expedient to do so."

Section 4 of the Act of April 21, 1858, P. L. 385, provides, inter alia:

"That no debt shall be contracted or warrant drawn against the city by said commissioners, except for purposes legally authorized and not to exceed the appropriation made therefor by councils."

In Harrison v. Philadelphia, 3 Phila. 138, it was held the city commissioners had no power to contract for the repair or alteration of the courthouses, unless councils had first made an appropriation to defray the expense.

Section 5 of the Act of May 13, 1856, P. L. 567, provides:

"The City Commissioners shall draw no warrants upon the city treasury, for the payment of the fees of jurors, viewers, witnesses, or officers of the Courts, without a certificate of the prothonotary or clerk of the Court, countersigned by one of the judges of the Court in which the duty or service was performed, that the same is correct to the best of his belief, nor shall any warrant be drawn for jury or witness fees, in favor of any person, but the juror or witness entitled to such fees."

It would thus appear that the city commissioners may draw warrants upon the city treasurer for certain purposes not to exceed the appropriations therefor made by councils and that they have the obligation to perform all other duties which at the time of the passage of the act of February 2, 1854, were performed by the commissioners, not otherwise provided for in that act. It would also ap-

pear that as late as 1879 the city commissioners had "the duty of furnishing the sheriff with the necessary supplies, subject to the control of Councils:" Wright v. Philadelphia, supra. Is it unreasonable then to assume that the admitted existence of a fund specially appropriated by councils to the commissioners for the purpose of meeting house of detention expenses, would necessarily imply that all the requirements of councils had been fully complied with by the commissioners, or the admitted appropriation to them would not have been made? Why need we consider the question of the power of councils "to raise money" when the very money has been raised and appropriated?

If, as the respondent contends, the act of February 2, 1854, sec. 39, makes it the duty of the inspectors of prisons on or before the first day of March in every year, to furnish councils with an estimate of the amount that in their judgment will be required during the current fiscal year for the expenses of the inspectors of the prison, does not the act of July 2, 1901, make it the duty of the commissioners to pay the expenses of the House of Detention, and are they not the officials who are to furnish councils with the estimate, and as councils have appropriated a sufficient sum to pay those expenses, which is admitted, must it not have been because the commissioners have done what the relator contends the inspectors of the prisons are required to do, because they and not the uncompensated managers are the ones "required to pay the said expenses"?

We have already shown that the constitution, art. XIV, sec. 1, provides:

"County officers shall consist of . . . . commissioners, treasurers, auditors or controllers . . . . and such others as may from time to time be established by law."

The city treasurer is a county officer: Com. v. Oellers, 140 Pa. 457; Bonnell v. City, C. P., No. 5, June Term, 1910, No. 2,300, as is also the city controller: Taggart v. Com., 102 Pa. 354.

The Board of Managers of the House of Detention are performing not a municipal, but a county function in maintaining a place for the confinement of children awaiting trial in a court of justice.

At the argument it was stated, without contradiction, that the appropriations by councils to the city commissioners were made in lump sums "to pay bills approved by the Board of Managers of the House of Detention on receipt of a certificate of said Board as to their correctness," and that no written contract or advertisement was required.

We must therefore conclude that the materials furnished for the maintenance of the house of detention, not being "materials required by the city," and contracts made therefor not "relating to city affairs," no advertisement nor written contract was required therefor.

We will now consider the third question raised by the return of the respondent, viz.:

Is the act of July 2, 1901, under which the relators hold office, unconstitutional for the reasons advanced by the respondent?

1. The return sets out that the act is unconstitutional, because it violates sec. 3, art. III, of the constitution of Pennsylvania, which provides:

"No bill . . . . shall be passed containing more than one subject, which shall be clearly expressed in its title."

In Clearfield County v. Poor District, 135 Pa. 86 (89), it was held that an act entitled "to organize the State Hospital for the Insane, at Danville, and provide for the government and management of the same" did not violate the provisions in the constitution of 1838, providing that an act shall not contain more than one subject. The reasoning of that case is equally applicable here.

In Rose v. Beaver County, 204 Pa. 372, BEAVER, J., in the Superior Court (which opinion the Supreme Court affirmed) said:

"1. As to the title. In Com. v. Lloyd, 2 Pa. Superior Ct. 6, the subject of the sufficiency of the title of an act of

assembly was very carefully considered and all our cases
to that date carefully analyzed and, as a result, it was
there stated that 'it is not necessary that the title of act
should be a complete index of its contents.'

" 'If the title fairly gives notice of the subject of an act
so as reasonably to lead to an inquiry into the body of the
bill, it is all that is necessary.' The title of this bill is
general, but it is not comprehensive. It does not descend
to details, but no one interested in the general subject
of the formation of poor districts, the purchase of lands
and the erection of buildings, and the furnishing of relief,
and giving employment to the destitute poor would not
have such general notice as would lead him to make in-
quiry into the body of the bill. There is nothing in the
bill which does not relate to the general subject outlined
in the title. The opinion of Mr. Justice Mitchell, in
Sugar Notch Borough, 192 Pa. 349, applies in many re-
spects to all the questions raised in this case. It is there
said:

" 'It must not be lost sight of that the attitude of courts
is not one of hostility to acts where constitutionality is
attacked. On the contrary, all the presumptions are in
their favor, and courts are not to be astute in finding or
sustaining objections.' The evil at which the constitu-
tion was aimed is thus stated with great clearness by the
present chief justice in Road in Phœnixville, 109 Pa. 44:
'The design and scope of this constitutional amendment,
adopted in 1864, are readily understood, when we consider
the mischief which it was intended to remedy. Prior to
that date the vicious practice had obtained of incorporat-
ing in one bill a variety of distinct and independent sub-
jects of legislation. The real purpose of the bill was
often, and sometimes intentionally disguised by a mis-
leading title or covered by the all-comprehensive phrase
"and for other purposes," with which the title of many
omnibus bills concluded. Members of legislature, as well
as the general public, were thus misled or kept in ignorance
as to the true character of proposed legislation. This

being the evil intended to be remedied, the constitutional requirement as to the title is not to be strained to apply to cases not really within its reasonable intent.' See also Com. v. Gilligan, 195 Pa. 504."

We are of the opinion the title of this act is well within the principles there set out and does not violate the constitution. "Providing for the management and maintenance thereof" would surely call attention to the matter of expenses, and how they are to be provided.

2. The return sets forth that the act violates art. VII, sec. 3 of the constitution of Pennsylvania, but the reference is to art. III, sec. 7 in the respondent's counsel's brief. This provides:

"The General Assembly shall not pass any local or special law . . . . regulating the affairs of counties, cities," etc.

There are numerous authorities on this question, but the principles deducible are these:

A general law applies to the whole state, and affects all objects or all members of a class of objects to which it can appropriately apply. When it is said that a general law applies to the whole state, it is not meant that it must necessarily affect all parts of the State; but that no portion of the commonwealth shall be specifically excluded, and that the law shall apply wherever these objects may be found.

A local law applies to but a portion of the commonwealth; and a special law is one which affects some members of a class of objects, to the exclusion of others. Cities may be classified, and legislation applying to one class is general: Wheeler v. Philadelphia, 77 Pa. 338. This is so whether the subjects relate to municipal functions or not; that is, there are certain subjects which require peculiar regulations in large centers of population, and laws relating to subjects and applying only to cities of a certain class may be general—as a law regulating undertaking in cities of first, second and third classes—Com. v. Hanley, 15 Pa. Superior Ct. 271—and one prohibiting the establish-

ment of hospitals or pesthouses in built-up portions of the city: Com. v. Hospital, 198 Pa. 270.

The classification must be so made that the law will apply to others not members of the class at the time the law is passed, but which may in the course of time become members.

Not only cities, but counties and other political and municipal divisions may also be classified. In Lloyd v. Smith, 176 Pa. 213, Mr. Justice MITCHELL said (218):

"But even in regard to some of the prohibited subjects, such as the affairs of counties, cities, etc., it was very early found that there were such differences in situation, circumstances and requirements of the cities of the commonwealth, that classification with reference to their governmental machinery was of imperative necessity, and it was accordingly sustained, and the principle established that a law which does not exclude anyone from a class, and applies to all the members of the class equally, is general. The same principle must make classification constitutional as to the other political and municipal divisions of the state when considered in their governmental capacity. Classification of counties is therefore as permissible as classification of cities, and the legislature may determine what differences in situation, circumstances and needs, call for a difference of class, subject to supervision of the courts as the final interpreters of the constitution, to see that it is actually classification, and not special legislation under that guise. The presumption is always in favor of the legislative command, and it must prevail unless clearly transgressing the constitutional prohibition."

It would therefore seem to be clear that the confinement of children awaiting trial in a separate house of detention is a subject requiring peculiar regulation in large centers of population, as compared with rural or country districts, and further, that this act is not special or local, but general, within the principles laid down by the decisions under this section and article of the constitution.

"The averment of the return that one mandamus is improper here is without merit. The countersignature of the warrants by the controller is a ministerial act required by law.

"The fact that there are two warrants for two different contracts is not material. The contracts are both for materials furnished for the maintenance of the House of Detention. The only question is whether the city controller shall countersign warrants for such purposes. Both involve the same facts and the same provisions of the law, and his countersignature of warrants is the act to compel which this mandamus is issued."

It is ordered that a peremptory mandamus shall issue as prayed for by the relators.

*Error assigned* was the judgment of the court.

*Robert Brannan*, with him *T. D. Finletter*, assistant city solicitor, and *James Alcorn*, city solicitor, for appellant, cited: Com. v. Oellers, 140 Pa. 457; Taggart v. Com., 102 Pa. 354; Dechert v. Com., 113 Pa. 229; Runkle v. Com., 97 Pa. 328.

*John G. Johnson* with him *Benjamin O. Frick*, for appellees.

OPINION BY ORLADY, J., March 1, 1912:

The court below directed that a writ of peremptory mandamus should issue commanding the city controller to countersign two warrants for payment by the city treasurer, of certain itemized bills and vouchers which had been duly certified by the county commissioners, for the purchase of supplies for the House of Detention, etc.

The whole question is so exhaustively and clearly disposed of by the court below that it is not necessary to present any further argument, and the judgment is affirmed for the reasons stated in the opinion filed in making the order.